UNITED STATES BANKRUPTCY COURT          <u>FOR PUBLICATION</u>
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
In re
     JEFFREY D. SCHMITT                     Case No. 14-11068 MJK
                 Debtor
------------------------------------------------------------------
BROADWAY WAREHOUSE CO.
                 Plaintiff

     -vs-                                   AP No. 14-1069 K

JEFFREY D. SCHMITT
                 Defendant

------------------------------------------------------------------
In re
     KEVIN P. SCHMITT                       Case No. 14-12402 MJK
                 Debtor
------------------------------------------------------------------
BROADWAY WAREHOUSE CO.
                 Plaintiff

     -vs-                                   AP No. 15-1018 K

KEVIN P. SCHMITT
                 Defendant
------------------------------------------------------------------
In re
     ERIC R. PENTON
                 Debtor        Case No. 14-11421 CLB
------------------------------------------------------------------
BROADWAY WAREHOUSE CO.
                 Plaintiff
     -vs-                                   AP No. 14-1074 K

ERIC R. PENTON
                 Defendant
------------------------------------------------------------------

James Michael Lennon, Esq.
Blair & Roach LLP
2645 Sheridan Drive
Tonawanda, NY   14150

Attorneys for Broadway Warehouse Co.


Charles Marchese, Esq.
Gleichenhaus, Marchese & Weishaar, P.C.
930 Convention Tower
43 Court Street
Buffalo, NY 14202

Attorneys for Jeffrey D. Schmitt


Jason J. Evans, Esq.
5355 Main Street
Williamsville, NY   14221

Attorney for Kevin P. Schmitt


John H. Ring III, Esq.
6195 W. Quaker Street
Orchard Park, NY   14127

Attorney for Eric R. Penton


<u>OPINION, DECISION AND ORDER DENYING DISCHARGE, AFTER TRIAL</u>


These are three Adversary Proceedings that came to trial on a consolidated

basis on consent of all parties.   Trial was held in October of 2015, and post-trial

submissions ended on December 11, 2015.  The Adversary Proceedings seek both denial

of discharge under 11 U.S.C. §727, and denial of discharge under 11 U.S.C.§523(a)(2)(A)

and (a)(6) as to the Plaintiff's individual claims, which claims arose from the operation of a family business by the Debtors.

What are the bankruptcy consequences for young adults claiming important offices in businesses that failed?  Social media is involved.  Family businesses often place "the kids" in financial jeopardy if one or more of the kids end-up here.  There might be a tax issue.  (That happened here.)   Perhaps a labor issue as to unpaid employees.  (That also happened here.)  The "kids" here are adults.  Here, it is an unpaid rent issue on a large scale (over $400,000), as adjudged by a state court of competent jurisdiction.

The family business here was not what one might think of as a "Mom and Pop" operation, like a small store.  It was a trucking "enterprise" and "business" that often grossed hundreds of thousands of dollars in annual revenues.[1]  The significance of the use of the amorphous terms "business and enterprise" will be discussed below.  It involves transfer of assets among *de jure* entities, use of d/b/a's, keeping material matters "off the books", undocumented "corporate" or "partnership" matters and the like.


THE FACTUAL HISTORY

What follows are Rule 52 Findings of Fact.

These are objections to discharge under 11 U.S.C. § 727 and to dischargeability of the large debt under 11 U.S.C. § 523.  They were consensually

---

[1] Eric Penton was not a member of the family, but he was hired because his father was close friends with the Schmitts' father.

consolidated for trial.  (Chief Judge Bucki transferred one of these A.P.s to this writer to achieve that result.)

The Plaintiff rented substantial commercial space in its apparently-large real estate out to an entity that was a *de jure* corporation at one time (National Courier, Inc.), and obtained the signature and personal guarantee only of <u>one</u> individual, David Schmitt, who is the father of two of these Debtor/Defendants.  (Again, only one business entity and one individual, and neither are debtors here.)  The trucking/delivery business that operated in the leased space changed names two or three or more times, and possibly did not establish, *de jure,* some business names under which it operated.  But it did establish some *de jure* entities, and also morphed into different trade styles (such as "Three Kids Trucking") even though it still sometimes represented itself to be "National Courier", even after National Courier, <u>Inc.</u> ceased corporate existence under New York statutes.

A state court judgment that binds this Court (discussed at length below) cuts through all of the comings and goings of the names by which the trucking entity wanted to be known, and this Court will use the terms "the business" or "the entity" to refer to the activities conducted by these three Debtors (and others) at the Plaintiff's  premises.  The business was subpoenaed and did provide some books and records as to bank accounts and some other accounts, but did not provide books or records as to the <u>business structure</u> of National Courier or <u>any</u> of its progeny.  Nor did any of these Debtors provide any such evidence.  No records of ownership, officers, directors, or the like.  (I.e., no "corporate kit" or "partnership kit".)   The business did keep some records that were provided to the

Plaintiff, but none to support the Debtors' argument that they were "merely W-2 employees", as opposed to part owners, or officers or directors, etc. (The Debtors offered none of those records in their own defense.)

Plaintiff Broadway Warehouse Co. obtained a joint and several judgment against Debtors Jeffrey Schmitt, Kevin Schmitt and Eric Penton (along with David Schmitt and National Courier, Inc.) in a rent collection action brought by it in New York State Supreme Court, Erie County. The total sum was $432,016.76, entered on April 1, 2014. That judgment emanated from a motion by Broadway Warehouse to strike the answer of the defendants there, and to enter judgment for the relief requested in the state court complaint, because the defendants failed to comply with a prior order of the state court compelling discovery. New York Civil Practice Law and Rules § 3126 states, "If any party, ..., refuses to obey an order for disclosure or wilfully fails to disclose information which the court finds ought to have been disclosed, pursuant to this article, the court may make such orders with regard to the failure or refusal as are just, among them: ... (3.) an order striking out pleadings or parts thereof, ..., or rendering a judgment by default against the disobedient party."   Thus by striking the defendants' answers and awarding judgment to Broadway Warehouse citing § 3126 specifically, the state court effectively ruled that all of the facts and claims asserted in that complaint could not be subject to any later defense once the state court's order and judgment became final, as discussed below.

One of those alleged facts and alleged claims stood for the proposition that these three Debtors (plus David Schmitt) operated an unincorporated business for profit,

sharing such profits - - the very definition of general partnership under common law (and N.Y. statutory law).  (N.Y. Partnership Law § 10.)

That procedural and substantive history in state court is critical to this Decision when one considers the Second Circuit's holding in the case of *Kelleran v. Andrijevic*, 825 F.2d 692 (1987).   That case originated in this Court before the Hon. Beryl E. McGuire (U.S.B.J. (since retired)).   The Circuit's decision has long stood for the proposition that a state court judgment that became final before a bankruptcy filing, has preclusive effect in the bankruptcy case absent a showing of lack of jurisdiction, or of fraud or collusion as to the obtaining of the state court judgment.  This writer often directs litigants who are faced with the issue of the preclusive effect of pre-bankruptcy judgments in dischargeability proceedings to the excellent exposition by Jeffrey T. Ferriell, "The Preclusive Effect of State Court Decisions in Bankruptcy," 58 American Bankruptcy Law Journal 349 (1984) and continued at 59 American Bankruptcy Law Journal 55 (1985). (This writer footnoted that exposition in the decision in the case of *In re Huber*, 171 B.R. 740, 747-749 (1994).  Also see, *In re Pillich*, No. 96-1150 Slip Opinion @ 6-12 (1996) affd. 96-CV-0809 E(F) Slip Op. (W.D.N.Y. Sept. 10, 1997) footnoted *In re Manko*, 11 -14123 K (Bankr. W.D.N.Y., January 10, 2014 @ p. 6) regarding the application of *Andrijevic*.)

While the striking of the answers of the Debtors in the state court action resulted in a "default judgment", they  had appeared and answered there in that action and had "a full and fair opportunity to litigate" the matters presented there. This Court is bound under *Andrijevic*.  (They did not appeal the order of the state court striking their Answer and

they did not appeal the ultimate state court judgment, nor did they argue at the trial before <u>this</u> Court that the state court lacked jurisdiction, or that the state court judgment was obtained by fraud or collusion.[2])

      *Andrijevic* was not the Second Circuit's only ruling about what is involved here.  In the case of *Evans v. Ottimo*, 469 F.3d 278 (2006), it reiterated that a defaulting party in a state court action may not re-litigate liability in a dischargeability proceeding in bankruptcy court, because the doctrine of <u>collateral estoppel</u> applies.  Although the judgment in *Evans* was by default, the Circuit found that the Defendant had a "full and fair opportunity to litigate the issue."  *Id*. at 282.

## THE EFFECT OF THE STATE COURT JUDGMENT

      In New York, a defendant who has a meritless defense is better advised not to "Answer" rather than to disobey a discovery "Order" after an Answer.  The New York Court of Appeals as far back as 1924 has ruled that trial courts have the power to allow the filing of a default judgment against a defendant who fails to produce evidence material to the defense of the action, thereby resulting in the "presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense."  *Feingold v. Walworth Bros.,* 238 N.Y. 446 (1924).

---

[2]The Debtors attempt to brush-away the state court judgment, and brush-away all of its implications under *Andrijevic*, by arguing that they were misled by David Schmitt into using the same lawyer (in the state court action) for all of them, plus David, plus their business.  Their argument "begs the question" in the true sense of that phrase.  Does their combined reliance on one lawyer mean that *Andrijevic* does not apply here?  No.  Precisely the opposite.  State law matters decided in state courts must not result in re-litigation in bankruptcy court.  And so one who is sued in state court is ill-advised to assume that any bankruptcy court in the Second Circuit will provide a second bite at that apple.

More recently, both the New York Courts' "Second Department" (an intermediate appellate court) and the New York Court of Appeals (the highest court of the state) have held that although the striking of an answer is a drastic remedy, the failure of defendants to respond to discovery <u>and to comply with a court order has the effect of admitting "all traversable allegations in the complaint</u>. . . ."[3]  *Beneficial Mortgage Corporation v. Lawrence*, 5 A.D. 3d 339, 340 (2d Dept. 2004) and *Rokina Optical Co., Inc. v. Camera King, Inc.*, 63 N.Y. 2d 728, 730 (1984). [Emphasis added.]  In other words, the default judgment that results from disobedience of a discovery order has far greater consequences for a defendant than that which results from not answering at all.

With the holdings in *Andrijevic* and *Evans v. Ottimo* regarding the preclusive effect of a state court judgment, and the New York Court of Appeals rulings that a default judgment has the effect of an admission of <u>all</u> causes of action alleged in the complaint, we examine (rather than merely recite) the causes of action in the state court complaint and their impact on these § 727 and §523 proceedings.

The "Second Cause of Action" in that state court complaint alleged that the business that was leasing property from Broadway Warehouse was National Courier, Inc., and that it was a "co-owned business enterprise [that was] operated for profit by its partners, David Schmitt, Jeffrey Schmitt, Kevin Schmitt and (Eric) Penton," and "each of the parties are liable to Broadway Warehouse for the obligations of National Courier."[4]

---

[3] According to Black's Law Dictionary, "traverse" means "a formal denial of a factual allegation made in the opposing party's pleading."

[4] State Supreme Court Complaint -*Broadway Warehouse Co. v. National Courier, Inc., David Schmitt, Jeffrey D. Schmitt, Kevin P. Schmitt and Eric R. Penton* dated Aug. 15, 2012, Index #2012-605880 filed Aug. 16, 2012 p. 6

The "Fourth Cause of Action" in that complaint alleged that the Debtors and David Schmitt were "actively engaged on a full-time basis at the Property in operating the substantial business being conducted by them in the name of NCI."[5]  It also alleged that the Debtors and David Schmitt were ". . . knowingly and willfully failing to keep and maintain proper business and accounting records from which the receipts, profits and operations of the business being conducted by them could be ascertained, in a further effort to defraud BWC (Broadway Warehouse Co.)"[6] (The fact that "actual fraud" does not require a "false representation", but rather may consist of inter-company transfer schemes was made clear in *Husky International Electronics, Inc. v. Ritz,* 136 S. Ct. 1581 (2016).)

The state court judgment ultimately obtained by Broadway Warehouse against these Debtors effectively binds this Court (as discussed extensively below) to the finding that they were partners in the business of National Courier, Inc., that the "spinoff" entities from National Courier were "sham" entities [see Plaintiff's Requested Findings of Fact ¶2] and that they failed to keep and maintain proper business records.

Further, the "Fourth Cause of Action" in the complaint in the state court action alleged that the Debtors as operators of National Courier, Inc. "... knowingly and willfully fail[ed] to keep and maintain proper business and accounting records in a further effort to defraud BWC (Broadway Warehouse)."[7] Again, because there was no showing at the trial

[5]State Supreme Court Complaint - *Broadway Warehouse Co. v. National Courier, Inc., David Schmitt, Jeffrey D. Schmitt, Kevin P. Schmitt and Eric R. Penton* dated Aug. 15, 2012, Index # 2012-605880 filed Aug. 16, 2012 p. 7-8.

[6]State Supreme Court Complaint - *Broadway Warehouse Co. v. National Courier, Inc.,  David Schmitt, Jeffrey D. Schmitt, Kevin P. Schmitt and Eric R. Penton* dated Aug. 15, 2012, Index # 2012-605880 filed Aug. 16, 2012 p. 8.

[7]State Supreme Court Complaint - *Broadway Warehouse Co. v. National Courier, Inc.,  David Schmitt, Jeffrey D. Schmitt, Kevin P. Schmitt and Eric R. Penton* dated Aug. 15, 2012, Index # 2012-605880 filed Aug. 16, 2012 p. 8.

held in this Court that the state court judgment was obtained by fraud or collusion or that

that court lacked jurisdiction, that judgment binds this Court.  (*Andrijevic*; CPLR 3126 and

*Evans*)  Thus, the granting of a discharge to any one of these Debtors over the §727(a)(3)

objection by the Plaintiff, hinges on whether any of them presented persuasive evidence

at trial before this Court that their failure to keep books and records regarding their

business transactions was "justified under all of the circumstances of the case."[8]

RELEVANT UNDISPUTED FACTS[9] AS TO "JUSTIFICATION"

The relevant facts for each Debtor/Defendant will be discussed in the order

in which they joined the business, and not the order in which their Chapter 7 Petitions were

filed. (There is an "ADDENDUM" to this Decision that contains other Rule 52 findings, with

citations to documents in evidence.)

First, then, is Jeffrey Schmitt, BK No. 14-11068.  He was approximately 19

years old in January of 1997 when he started employment with the company that became

National Courier, Inc. in 1999.  (He attended Medaille College to pursue a business degree

but later changed his course of study to criminal justice and it appears that he did not

obtain a degree.)  Almost fourteen years later (on November 3, 2010) he was cited (as an

---

[8]11 U.S.C. § 727(a)(3).

[9]Over 60 exhibits offered by the Plaintiff were received in evidence.  Others were denied admission upon objection by one of more of the Debtors.  Others were admitted for limited purposes only.  No more than one exhibit (for identification) was offered by any of the Debtors at trial.  An affidavit by David Schmitt signed approximately one year prior to trial for an unknown purpose that seemed to be offered to bolster the witnesses' testimony and was disallowed by this writer.  The Debtors' post-trial efforts to have this Court consider David Schmitt's problems with the justice system were rejected by this Court.

"employer") by the New York State Department of Labor for a violation in an amount close to $73,000. More than a year and a half after that he was sued in state court by the Plaintiff here, Broadway Warehouse, in the lawsuit described above. Almost a year and a half after that suit was begun he left employment at the business, just two months before entry of the state court judgment, and just three months before he filed for Chapter 7 relief here. So he worked for about seventeen years in the business.

The Plaintiff has provided evidence of a May, 2014 account at LinkedIn by which Jeffrey Schmitt represented himself to be an "owner" and "operations manager" of "National Courier, Inc.", and evidence that only he could have made that claim on LinkedIn. The Court finds that he did make that claim.

Although he prepared (for trial) a handwritten list of personal loans and reimbursements from the business for the period from June 9, 2012 to January 13, 2014, he provided no other books or records to cover his non-W-2 financial involvement during his seventeen year employment with the business. That submission (1) belies his claim that he was merely "an employee" and (2) raises more questions than it answers. The Court finds, in fact, that it supports the Plaintiff's view that his failure to keep sufficient records "was not justifiable".

Now to his younger brother. Kevin Schmitt filed Case No. 14-12402. He did not begin employment at the business until 2004. His formal education ended upon high school graduation. Like his brother Jeffrey, he was cited by the Department of Labor in 2010 for almost $73,000 in violations as an "employer" and was sued by the current Plaintiff in August of 2012.

He left the business in August of 2013, seven months before the entry of the state court judgment. He filed for relief under Chapter 7 on October 17, 2014. So he participated for eight or nine years, including almost three years after the Department of Labor citation. He provided some personal banking records but failed to disclose a second account at Citizen's Bank into which thousands of dollars were transferred from the Citizens Bank account that he did disclose.[10]

Lastly, Eric Penton filed case No. 14-11421. He is the son of a friend of David Schmitt. He started employment at National Courier in August of 2009. He was approximately 23 years old and had a 4-year degree in Accounting from Daemen College. Later in that same month, he claimed on an insurance application with Guardian Life that his job title was "Controller". Three years later he was sued in the state court action described above. A year after that (2013) he was subpoenaed by the U.S. Attorney who was investigating possible I.R.S. violations in connection with the business, and more than half a year later the state court judgment was entered. The judgment was entered on April 1, 2014, and Penton left the business that same month, and filed his Chapter 7 Petition two months after that.

Mr. Penton did not produce any books or records of the business in his own defense. He did produce some of his personal bank records.

The purpose of this exercise in chronology is to raise the question as to each Debtor individually, "Didn't there come a point in time beyond which your purported reliance on David Schmitt to maintain adequate books and records of the business activities was

---

[10]For example, from November 2010 to June 2012, $8,624 was transferred to the undisclosed account.

no longer 'justifiable' in §727 terms?"  The Department of Labor "Violation Notice" was served on Jeffrey Schmitt and Kevin Schmitt, dated November 3, 2010.  In 2010 Jeffrey was approximately 32 years old and Kevin was somewhat younger.  Jeffrey continued to work at the business for more than three years after that notice and for more than a year after being sued by Broadway Warehouse.  Kevin Schmitt continued in the business for almost three years after the Department of Labor Violation Notice, and almost exactly a year after being sued by Broadway Warehouse.

Eric Penton did not come to the business until 2009, and he was <u>not</u> served with the Department of Labor Violation Notice, and (so far as the evidentiary record goes) might not have known that anything was amiss until he was sued by Broadway Warehouse in August of 2012.  (The Court finds, however, that he <u>should</u> have known that something was amiss when he learned of substantial repeated "factoring" transactions that were not to be entered in the "QuickBooks" system that he otherwise maintained.  His degree was in "accounting".)  Nonetheless, he did not leave the business until a year and eight months later, shortly after the state court had rendered its judgment against him.  But additionally there was a Workers' Compensation Board Judgment against Eric Penton for $4,000, by which that Board considered Eric Penton to be the "President" of National Courier.  The documentary evidence does not show a date.  There also appears to have been an attempt by the I.R.S. to collect withholding taxes owed by National Courier, Inc. from him personally because he had signed documents as president of the business. These facts suggest that the exuberance of Mr. Penton, just after he was hired in 2009, in making a life insurance application to Guardian Insurance in which he declared himself to be the

Controller of National Courier (and signing documents in which he was named president of the entity), was unwise.  That would be irrelevant were it not for the fact that in May of 2014, one month after leaving the business, he still maintained a LinkedIn account claiming to have been the accountant at National Courier, and the Controller at National Express Couriers.

Certainly Broadway Warehouse is not a hapless victim.  It saw the Debtors and David Schmitt doing business on Plaintiff's premises under various names running-up huge rent arrears, but it did not demand a new lease and new personal guarantees.  That said, this Court is bound (by *Adrijevic)* to the state court ruling that established that these three Debtors did not maintain adequate business records for the purposes of such provisions of state law as were necessary to a defense in Broadway Warehouse's lawsuit against them.  And the adequacy of the books and records of the business and that of the books and records of each Debtor here are <u>more</u> than merely intertwined.


THE STATE COURT JUDGMENT AS TO THE INSUFFICIENCY OF THE BUSINESS RECORDS FATALLY INFECTS THE DEBTORS' §727(a)(3) "JUSTIFICATION" DEFENSE

For purposes of this case there is no meaningful distinction between the financial records of the enterprise/business and those of the Debtors.  There are many factors combining to lead to that conclusion.

(1) The paucity of personal records.  Eric Penton provided only bank records

and tax returns.[11]  Kevin Schmitt provided bank records for a credit union account and only

one of his Citizens Bank accounts (hiding another) plus his tax returns.  Jeffrey Schmitt

provided his bank statements and tax returns, but also provided statements for one of his

credit card accounts, and a handwritten effort to reconstruct transactions between himself

personally and the business, "based on memory", not based in any sort of

contemporaneous record-keeping.

      (2) Generally, the three were paid only in cash, and they attest that they were

not regularly paid on time.  Rather, they often forgave delinquency in the payment of

wages.  Not only does that belie the defense of "I was just an employee", but it also calls

into question Jeffrey Schmitt's handwritten "reconstruction" of payments received from the

business "on account of owed pay".[12]  If any business records would support the income

tax records provided by the Debtors, none of them offered any such records in their own

defense, not even as to the verity of their W-2 statements.  Whatever their tax records

might say, the Court finds that their true dealing with the business was largely off-the-

books.

      (3) Neither Jeffrey Schmitt nor Eric Penton report any income from any

source other than the business while they were employed there.  (Jeffrey Schmitt discloses

his wife's income.)  Kevin Schmitt had a second job, and his payroll from that job was on

---

[11] In a family business such as this (see footnote 1 above as to Eric Penton), W-2 statements are unreliable.  They say what the family wants them to say, unless a bank loan or other exigency requires (and results in) audited records.

[12] On that handwritten submission (Exhibit #39 in evidence), he noted "Personal good faith loans made to National Courier/David Schmitt (to the best of my ability) based off statements." [Sic] It is rife with entries like these: "7/30/12  +2200.00 repay of 677.67/rest towards owed pay", "9/11/12  +1900.00 repay of 295.00/ rest towards owed pay", and "4/16/13  +3730.00 repay of loans, rest towards pay".

"direct deposit"; consequently, there is no question as to that income. To the extent that their income (and, therefore, bank deposits) depended entirely upon the business, all deposits, and (particularly) unexplained deposits had to have come from the business, and none of them offered any contemporaneous books or records to assist an analysis of their bank statements.

(4) The business records were preclusively ruled to be inadequate to permit the Plaintiff to ascertain the financial affairs of the business (as discussed above), and these three Defendants were preclusively ruled in state court to be responsible for the inadequacy of the business records.

(5) Each of the three previously denied under oath that they were anything more than "mere employees". (The Plaintiff, in its proposed Findings of Fact, documents those instances, whether such denials were contained in pleadings, discovery materials, or depositions in state court or in this Court, or at § 341 meetings, Rule 2004 examinations or at trial before this Court.) And yet, each of the Defendants has eventually acknowledged having engaged in financial transactions that are not normal employer-employee relations. The government actions against or directed at each of them makes that fact clear because none of them left the business in response thereto. There was testimony about the running of substantial amounts of cash to or from a "factor" named Ed Smith. Jeffrey and Kevin should have recognized (and certainly Eric Penton, with a degree in accounting and in charge of the business' books must have recognized) that the failure to properly account for those transactions on a day-by-day basis, was not proper, and exposed them

personally to liability.[13]

(6) Two of the three Debtors are brothers, and the third is the son of a family friend. To this writer, the business was a "family business" even as to Eric Penton.

(7) None of the Defendants offered any evidence in support of their burden of proof to establish that their reliance upon David Schmitt was adequate "justification" for their failure to make sure that there would be books and records "somewhere" to vindicate them from liability for the $400,000 judgment that was rendered against them individually. Indeed, the Plaintiff has repeatedly argued that it brought to the trial in this Court all of the business records it received in discovery, so that the Debtors would have access to them so that they could offer up anything that might support their defense. They offered nothing from any business records.

Finally, none of these Debtors specifically disputed any of the Plaintiff's one hundred and sixty-six "Requested Findings of Fact", many of which are accepted by the Court in the Addendum to this Decision.

## CONSTRUCTION AND INTERPRETATION OF "JUSTIFICATION" IN THIS CONTEXT

To repeat, the *Andrijevic* holding does not require this Court to apply the state court decision without regard to the clause in § 727(a)(3) that states "unless such act or failure

---

[13]In fact, Eric Penton testified at his deposition (Exhibit #66 @ p. 131), that he remained at the business due to "tax issues" in an attempt to correct "the situation" (as he called it) as he knew there was a possibility of his being liable especially due to his being previously named as the "President" of the business. His testimony here was that he presumed that the business' tax accountant would reconcile all of the "factoring" transactions with the QuickBooks' accounts that he controlled. In other words, he kept important matters "off-the-books" on a daily basis, leaving the IRS matters to others, until he was put at possible jeopardy.

to act was justified under all of the circumstances of the case."  That is uniquely a bankruptcy law matter.  Rather, the operation of CPLR § 3216 in tandem with *Andrijevic* is such that these Debtors may not be heard by this Court to deny that they operated unincorporated businesses for profit (and, therefore, operated a *de facto* partnership) and that they failed to maintain adequate books and records of that business to explain why Broadway Warehouse could not find assets from which it might have sought pre-judgment provisional relief, or post-judgment collection.  And it now having been found that the paucity of personal records made it critical (for the Debtors' sake) that the business records have been robust, it can be seen that a bankruptcy discharge for these Debtors was doomed when they lost the state court case.  That said, it is important to be clear about the "justification" defense, and its burden of proof.  The Second Circuit Court of Appeals has been very specific about the defense, but its statements offer little guidance.  In the case of *In re Cacioli*, 463 F. 3d 229, 234-236 (2006), the Circuit set the background of the "justification defense" this way:

> "Section 727(a)(3) also ensures that 'creditors are supplied with dependable
> information on which they can rely in tracing a debtor's financial history'. . .
> To implement this record-keeping requirement, § 727(a)(3) provides a two-
> step approach.  The initial burden lies with the creditor to show that the
> debtor failed to keep and preserve any books or records from which the
> debtor's financial condition or transactions might be ascertained. . . .  If the
> creditor shows the absence of records, the burden falls upon the bankrupt
> to satisfy the court that his failure to produce them was justified. . . .  'Each

case must stand upon its own facts with the inquiry always as to whether the bankrupt has sustained the burden of justification which the statute places upon him for his failure to keep adequate records.'"  [Authorities omitted.]

Then the Circuit Court stated this:

"While the Bankruptcy Code does not define what constitutes justification for a failure to maintain records under § 727(a)(3), we have stated that whether a debtor's failure to keep books is justified is 'a question in each instance of reasonableness in the particular circumstances.' . . .    '[The] issue of justification depends largely on what a normal, reasonable person would do under similar circumstances.'  It is a 'loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved.'" [Authorities omitted.]

The Court added, "We recognize that the appropriate inquiry as to justification . . . [extends to the] education, experience and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice."

The Circuit Court cited numerous cases in which justification was found or not found, without commenting on the appropriateness of those findings.  In the *Cacioli* case, the Circuit upheld the debtor's defense of "justification," but the facts were not the same as the facts currently before this Court.  (Mr. Cacioli was a high school graduate who eventually became a licensed real estate agent despite never having received any formal

education or training in bookkeeping, accounting, law, or business.  He grew a large business, and by the time he filed for relief under Chapter 7 in 1998 he listed 58 creditors holding unsecured non-priority claims totaling over $7.3 million, and attached an affidavit suggesting that he had no personal knowledge of the actual amounts due to 33 of these creditors comprising a little over $7 million of the estimated claims.  Apparently there were many *de jure* business entities under his control.  His defense against the § 727 Complaint was that he relied on one of his partners in an entity that he created, to maintain appropriate books and records.  That defense was upheld.)

At least one lower court in the Second Circuit has provided a bit more development upon the Circuit's somewhat un-illuminating discourse.  In the case of *In re Mitsopoulos*, 487 B.R. 604 (Bankr. E.D.N.Y. 2013), Chief Bankruptcy Judge Craig addressed the matter of "justification" for the lack of appropriate books or records.  The *Mitsopoulos* analysis contained the following propositions:

> "'Once the court determines that the records produced by the debtor are insufficient to enable the court, the trustee or the creditors to determine the debtor's financial affairs and business transactions, the burden shifts to the debtor to justify any deficiencies.' . . . 'Whether a debtor's failure to keep books is justified is a question in each instance of reasonableness in the particular circumstances.
>
> **"**Debtors have a duty to preserve those records that others in like circumstances would ordinarily keep.  . . .  Hence, the debtor's honest belief that he does not need to keep the records in question, or that his records are

sufficient, or his statement that it is not his practice to keep additional records, does not constitute justification for failure to keep or preserve records under § 727(a)(3).  . . .  If the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, then [the debtor] must show more than that '[he] did not comprehend the need for them and must carry [his] explanation by way of justification to the point where it appears that because of unusual circumstances [he] was under no duty to keep them.'

"In short, whether the debtor's failure to keep records was justified must be determined in light of all of the circumstances of the case. . . .  The court should consider the debtor's education, experience, the sophistication of the debtor's business, the debtor's personal financial structure, and any special circumstances that may exist. . . .  A sophisticated debtor is generally held to a higher level of accountability in record-keeping, and the more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records should be."  [Authorities omitted.]


CONCLUSION

If the Debtors were teenagers, then the defense of "I trusted Dad/David" probably would be "justification".  Not so as to Jeffrey Schmitt, a person in his early 30's, who had attended college and had been "operations manager" for the business.  And not

as to Kevin Schmitt, who hid a bank account from Plaintiff.[14]  And not as to Eric Penton who left all of the check and cash transactions with the "factor" to "others" when he controlled the QuickBooks' accounts, but told the world he was the controller of the business.  To put these AP's in perspective, the Court has considered the fact that family businesses are everywhere all the time.  What are the "kids" to do?  (Indeed, this writer was a W-2 wage earner in his family's business during some of his "teen" years.)   If you are in fact a W-2 wage earner and there is any chance that you could end-up here seeking to discharge business debts, then consider these points when you are still working there.

1.      Do not pronounce yourself (or let yourself be pronounced) to be an owner, officer, or director (etc.) on social media, business cards, letterhead, or otherwise, while the family business is incurring unpaid debt.  (You might be being used or manipulated, or unwittingly abetting civil or criminal fraud.)

2.      Keep careful personal financial records, especially as to your dealings with the family business.  (For example, loans to or from the business, carrying cash to or from others on a regular basis (except as to or from a bank.[15]))

---

[14]There was a technical defect in the "bankruptcy case" of Kevin Schmitt, which is to say "not in this A.P. within the" case.  The Order of January 16, 2015 that was Docket Entry #31 in Case #14-12402 that compelled production of bank records and appearance for a 2004 examination, and that was served on Kevin Schmitt's attorney, mistakenly stated that "Jeffrey D. Schmitt produce those documents in his possession... and to submit to oral examination under oath, both within 20 days after notice."  For that reason alone, the Court denies the Plaintiff's Motion for Default against Kevin Schmitt under Rule 55 and overrules the 11 U.S.C.§727(a)(6)(A) Cause of Action.  To the extent that Plaintiff's Motion for Default Judgment relates to the failure of counsel for Debtor Kevin Schmitt to appear at the initial pre-trial conference, it is similarly denied.

[15]Small businesses might pay its employees in cash for the employees' convenience.  (They might not have a bank account.)  That practice might-well require taking a check or withdrawal slip to a bank to get cash to put in their pay envelopes.  Bank records will show that.  But running money to a "Mr. Ed Smith"- - yes, "Mr. Smith"- - who was not produced by the Debtors to testify to his faithful recordation of National Courier's accounts with him, has contributed to the Court's decision today.

3.      If sued on a debt of the family business, get your <u>own</u> lawyer and see the matter through (on appeal if necessary).

4.      If a governmental agency asserts that you personally are accountable for business debt, get a lawyer to demand that the family business straighten-out all of the business records, and then leave the business, if necessary.

If a debtor, similarly situated comes to bankruptcy court but has not done any of the above, then this writer might conclude that he or she has received money that is "off-the-books", or has aided in "off-the-books" activities that injure a creditor or someone else. It would not pass "the smell test".  These three Debtors do not pass that test.

The Court sustains the Plaintiff's 11 U.S.C. §727(a)(3) Cause of Action, and the three Debtors' discharges are denied because they did not carry their burden of proving "justification" for what the state court found to be inadequate records.

The Court also sustains the Plaintiff's Cause of Action as to 11 U.S.C. §523 (a)(2)(A) fraud.  (See the above discussion of the state court judgment, in light of *Husky*.)

The counterclaims are deemed abandoned, and are dismissed.

Plaintiff's other causes of action are dismissed as moot in light of the Court's Decision.  Some Rule 52 "Findings of Fact" are contained above.  Others are expressly adopted in the "ADDENDUM" below.

The Clerk's Office is directed to enter this Decision and Order in all of the Adversary Proceedings and Bankruptcy Cases involving these Defendants/Debtors and

to issue a notice denying discharge in the Bankruptcy Cases to interested parties.


            SO ORDERED.

Dated:        Buffalo, New York
              August 9, 2016

                                          s/Michael J. Kaplan
                                          _____
                                                   U.S.B.J.



                                ADDENDUM

        In accordance with the above decision, the following "Requested Findings of

Fact" submitted by the Plaintiff are adopted as this Court's additional Rule 52 Findings of

Fact.  (Others are contained in the body of this Decision.)  (None of the Defendants offered

proposed Findings of Fact to dispute, with specificity, any of those proposed by Plaintiff.)

        Plaintiff's "Requested Findings" numbers 1 through 8 are adopted by Court

as the Court's own Rule 52 Findings of Fact.  Those deal with the business transactions

leading up to the lawsuit in state court in 2012.

        "Requested Findings" 9 through 12 are adopted as this Court's Rule 52

Findings of Fact.  Those deal with the discovery process and other processes in the state

court in 2012.

        "Requested Findings" numbers 18 through 24 are adopted as this Court's

Rule 52 Findings of Fact.  They address the state court proceedings that resulted in a

judgment in the amount of $432,016.76 against each of National Courier Inc., David

Schmitt, Jeffrey Schmitt, Kevin Schmitt and Eric Penton, in April of 2014.

"Requested Findings" numbers 25 through 45 are adopted as this Court's Findings of Fact under Rule 52. Those emphasize the role of David Schmitt in evading the efforts of the Plaintiff in discovery before this Court.

"Requested Findings" offered by the Plaintiff, argue, at Numbers 28 through 31 that David Schmitt was difficult in the present proceedings except when called by the Defendants to testify at trial. The "Requested Finding" by the Plaintiff at number 31 states that "David Schmitt also testified (on 10/8/2015) that all revenues and all of the expenses of the National Courier Business were inputted into the QuickBooks Accounting Program by Eric Penton on a regular basis." Penton testified here that the "factoring transactions" were not inputted in the QuickBooks application that he maintained. In fact, David Schmitt used the word "ledger" rather than referencing the QuickBooks program, but the Court gets the point. David Schmitt was referring either to the QuickBooks or to a ledger that has never been produced. The Court does not believe David Schmitt's testimony, but that does not help Penton. Penton knew that much was being transacted "off-the-books" that it was his duty as "Controller" to include in the books.

"Requested Finding" number 32 is adopted by the Court as its own Rule 52 Finding of Fact. It establishes two propositions. The first is that Eric Penton testified at trial that some of the businesses' bank accounts were titled in his name. That adds to the facts that belie his claim that he was "merely a W-2 employee." Secondly, he testified that the business did not use those bank accounts to deposit its receipts or to pay its expenses; the purpose of those accounts remains undisclosed.

"Requested Findings" 34 through 41 are adopted as the Courts own Rule 52 Findings of Fact. Those represent the failure of the Defendants to provide sufficient books or records of the business (such as articles of incorporation, by-laws, stockholder ledgers, lists of officers and/or directors, minutes of meetings of directors and/or shareholders, or the like, any journals or general ledgers, etc.). They also establish that the debtors offered nothing on their behalf at trial that might sustain their defense.

In a similar vein, the following "Requested Findings of Fact" are adopted by the Court as its own Rule 52 Findings: number 42 (establishing that the business had revenues of over three and a half million dollars from October 10, 2009 through December 31, 2013, and net income of nearly a million dollars over that period); number 44 and number 45 (for the proposition that none of the Defendants produced documents relating to the judgment which the New York State Workers' Compensation Board obtained against Eric Penton, or the judgment that the New York State Department of Labor obtained against Jeffrey Schmitt and Kevin Schmitt, or the attempts by the Internal Revenue Service to obtain payment directly from Eric Penton and Kevin Schmitt for tax liabilities of the business.)

"Requested Findings of Fact" numbers 46 through 75 are adopted by this Court as its own Rule 52 findings.

"Requested Finding" number 76 is adopted as to its allegations of fact, but not as to its conclusion "that Eric Penton's sworn discovery responses in the State Court Action were objectively false and intentionally misleading."

"Requested Findings" 77-81 are adopted by this Court to the extent that they state "facts" as opposed to "arguments" as to possible "conclusions of law".

"Requested Findings" 82 through 103 are adopted by this Court as its own Findings of Fact as to matters of fact (not to the extent they are supported only by Exhibit 57 which was not admitted into evidence), but not as to "argument" or what might deemed to be "conclusions of law".

The same is true as to "Requested Findings" 123 through 134, (not to the extent they are supported only by Exhibit 58 which was not admitted into evidence), except that this Court's Rule 2004 Order, prepared by the Plaintiff, incorrectly identified the subject of the 2004 Order.  Also, the Court does not adopt as "findings of fact" what actually are proposed "conclusions of law".

"Requested Findings" numbers 135 through 143 are adopted as this Court's Findings of Fact, but not as to any allegation that might suggest a bankruptcy crime, or intentionally misleading statements in Schedules or Statements.

As to Eric Penton, "Requested Finding" number 144 is adopted as to the statement of fact, but not as to the conclusion that he made a false oath.  That said, "Requested Findings" numbers 145 through 155 are adopted except to the extent that they relate to such trivial matters as an incorrect address for 1553 Harlem Road Inc., payment of $500 per month rent to his parents for living at home, $200 per month utility expenses for living at home, and having checked the "consumer debts" box rather than the "business debts" box on his petition, schedules and statements.

As to Kevin Schmitt, "Requested Findings" 156 though 158 are adopted by the Court.  The Court also adopts proposed finding number 159 to the effect that Kevin Schmitt "failed to disclose ... a joint checking (and savings) account with his wife at Citizens Bank."  As to that account, records have never been produced even though bank records that have been provided by Kevin Schmitt show e-transfers to that undocumented account.

The Plaintiff has submitted 89 "Requested <u>CONCLUSIONS OF LAW</u>."  Most of them are not implicated here, because of the prior state court judgment. (They would only be implicated if CPLR 3126, and the *Andrijevic and Evans* cases did not bind this Court.)  The relevant Conclusions of Law, for Rule 52 purposes, are expressed in the body of this Decision, above.